1  Jennifer A. Golinveaux (SBN: 203056)
   Winston & Strawn LLP
2  101 California Street, 35th Floor
   San Francisco, CA 94111-5840
3  Telephone: (415) 591-1506
   jgolinveaux@winston.com
4
   Diana Hughes Leiden (SBN: 267606)
5  Winston & Strawn LLP
   333 S. Grand Ave., 38th Floor
6  Los Angeles, CA 90071-1543
   Telephone: (415) 591-1506
7  dhleiden@winston.com
8  Attorneys for Movants
   ALTICE USA, INC. and
9  CSC HOLDINGS, LLC

10                **UNITED STATES DISTRICT COURT**

11                **CENTRAL DISTRICT OF CALIFORNIA**

12

13
    In re: Third Party Subpoena Issued to      | **Case No.**  2:23-mc-00181
14  OPSEC ONLINE LLC
                                                 **Related to No. 2:22-cv-00471-JRG in**
15                                               **the United States District Court**
    BMG RIGHTS MANAGEMENT (US)                  **Eastern District of Texas Marshall**
16  LLC; UMG RECORDINGS, INC.;                  **Division**
    CAPITOL RECORDS, LLC; CONCORD
17  MUSIC GROUP, INC.; and CONCORD             **NOTICE OF MOTION AND**
    BICYCLE ASSETS, LLC,                        **MOTION TO COMPEL**
18                                               **COMPLIANCE WITH THE**
            Plaintiffs,                          **SUBPOENA ISSUED TO OPSEC**
19                                               **ONLINE LLC; MEMORANDUM**
        v.                                       **OF POINTS AND AUTHORITIES**
20                                               **IN SUPPORT**
    ALTICE USA, INC. and CSC
21  HOLDINGS, LLC,
22          Defendants.
23
24
25
26
27
28

1        PLEASE TAKE NOTICE THAT, pursuant to Federal Rule of Civil Procedure

2    45, on a date and at a time to be determined by this Court, located in the First Street

3    U.S. Courthouse at 350 W. 1st Street, Suite 4311 Los Angeles, CA 90012-4565,

4    Movants Altice USA, Inc. and CSC Holdings, LLC (collectively, "Altice"), shall and

5    hereby do move the Court for an order compelling third party OpSec Online LLC

6    ("OpSec") to produce documents responsive to Altice's subpoena in *BMG Rights*

7    *Management (US) LLC, et al. v. Altice USA, Inc., et al.*, No. 2:22-cv-00471-JRF (E.D.

8    Tex.). The motion is based on this Notice of Motion; the accompanying

9    Memorandum of Points and Authorities; the Declaration of Diana Hughes Leiden

10   ("Leiden Decl.") filed concurrently with this motion and the exhibits thereto; all other

11   pleadings and papers on file in this action; all further argument or authorities as the

12   Court may request or permit; and all matters presented at the hearing on this motion.

13        Pursuant to Local Rule 7-3, Altice certifies that it has conferred in good faith

14   with counsel for Rightscorp on multiple occasions, beginning on August 15, 2023 and

15   thereafter, but the parties were unable to reach a resolution.

16

17   Dated:  December 20, 2023         Respectfully submitted,

18                        WINSTON & STRAWN LLP

19

20                    By:  */s/ Diana Hughes Leiden*

21                        Jennifer A. Golinveaux
                             Diana Hughes Leiden

22                    *Attorneys for Movants*

23                    ALTICE USA, INC. and
                      CSC HOLDINGS, LLC

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  INTRODUCTION ...................................................................................... 1

II.  BACKGROUND ...................................................................................... 2

A.  The Texas Action for Copyright Infringement ..................................... 2

B.  OpSec's Business of Enforcement and its History of Involvement in Plaintiffs'
Mass Copyright Litigations Against IPS ............................................... 4

C.  Altice's Subpoena To OpSec and OpSec's Objections and Refusals to Produce
Documents or Permit a Routine Source Code Review ........................... 5

III.  LEGAL STANDARD ............................................................................. 7

IV.  ARGUMENT ......................................................................................... 8

A.  This Court Should Transfer This Motion to Texas ................................ 8

B.  Altice Seeks Highly Relevant Discovery ............................................ 10

1.  Documents Regarding The Reliability of OpSec's and Audible Magic's
Services and Data Underlying the Verification and Notice-Sending Process ... 10

2.  Documents Relating to OpSec's Services and Relationship with Plaintiffs and
the RIAA ................................................................................................ 14

3.  Documents Relating to the Copyright Alert System (RFP No. 35) ................. 15

C.  OpSec's Objections Based on Plaintiffs' *Withdrawn* Representation that They
Would Not Rely on OpSec Evidence are Improper .............................. 16

D.  OpSec's Demand for Cost-Shifting is Premature and Baseless ........... 17

V.  CONCLUSION ...................................................................................... 18

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ........................................................................... 12

*Agincourt Gaming, LLC v. Zynga, Inc.*,
2014 WL 4079555 (D. Nev. Aug. 15, 2014)........................................................ 9

*Argento v. Sylvania Lighting Servs. Corp.*,
2015 WL 4918065 (D. Nev. Aug. 18, 2015)..................................................... 8, 9

*BMG Rights Management (US) LLC, et al. v. Altice USA, Inc., et al.*,
No. 2:22-cv-00471-JRF (E.D. Tex.) (Gilstrap, J.) ........................................... 1, 2

*Cont'l. Auto. Sys., U.S., Inc. v. Omron Auto. Elec., Inc.*,
2014 WL 2808984 (N.D. Ill. June 20, 2014)....................................................... 9

*Cox Commc'n, Inc. v. MarkMonitor, Inc.*,
Case No. 19-mc-80050-SK (N.D. Cal. Mar. 7, 2019, Dkt. 14)............................ 5

*In re Facebook PPC Advert. Litig.*,
2011 WL 1324516 (N.D. Cal. Apr. 6, 2011)...................................................... 13

*Kwong Mei Lan Mirana v. Battery Tai-Shing Corp.*,
2009 WL 290459 (N.D. Cal. Feb. 5, 2009) ....................................................... 17

*McAllister v. St. Louis Rams, LLC*,
2018 WL 6164281 (C.D. Cal. July 2, 2018) ...................................................... 17

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005).......................................................................................... 12

*Moon Mountain Farms, LLC v. Rural Cmty. Ins. Co.*,
301 F.R.D. 426 (N.D. Cal. 2014) .................................................................... 8, 9

*Nitsch v. DreamWorks Animation SKG Inc.*,
2017 WL 930809 (N.D. Cal. Mar. 9, 2017) ...................................................... 17

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) .......................................................................... 12

*Scott v. Carson Sheriff Dep't,*
　2020 WL 4108691 (C.D. Cal. Jan. 15, 2020) ....................................................... 7

*In re Subpoena to Kia Motors,*
　2014 WL 2118897 (C.D. Cal. Mar. 6, 2014) ..................................................... 10

*Trevino v. ACB Am., Inc.,*
　232 F.R.D. 612 (N.D. Cal. 2006) ...................................................................... 13

*UMG Recordings, Inc., et al. v. Bright House Networks, LLC,*
　Case No. 8:19-cv-710-MSS-TGW (July 29, 2022, Dkt. 723) ............................. 5

*Warner Bros. Records Inc., et al. v. Charter Commc'n.,*
　Case No. 1-19-cv-00874-RBJ-MEH (D. Colo. Oct. 5, 2020, Dkt. 253) .............. 5

*Wultz v. Bank of China, Ltd,*
　304 F.R.D 38 (D.D.C. 2014) ............................................................................... 9

**Statutes**

Digital Millennium Copyright Act ............................................................................ 3

DMCA ..................................................................................................................... 15

**Other Authorities**

Fed. R. Civ. P. 26(b)(1) ............................................................................................ 8

Fed. R. Civ. P. 45(a)(1)(C) ....................................................................................... 7

Fed. R. Civ. P. 45(d)(2)(B)(i) ............................................................................... 7, 8

Fed. R. Civ. P. 45(f) .................................................................................................. 8

Fed. R. Civ. P. 45(g) ................................................................................................. 8

Federal Rule of Civil Procedure 45(e)(2)(A) ......................................................... 18

Federal Rules of Civil Procedure Rule 45 ..................................................... 7, 8, 17

Rule 26 ...................................................................................................................... 7

Rule 26(b) ................................................................................................................. 7

Rule 45(c)(1)(A) and 45(d)(2)(B)(i) ......................................................................... 8

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Altice USA, Inc. and CSC Holdings, LLC (collectively, "Altice") hereby move to compel OpSec Online LLC ("OpSec") to comply with a third-party subpoena issued in a copyright infringement litigation brought against Altice by BMG Rights Management (US) LLC; UMG Recordings, Inc.; Capitol Records, LLC; Concord Music Group, Inc; and Concord Bicycle Assets, LLC's (collectively, "Plaintiffs") in the Eastern District of Texas (the "Underlying Litigation").[1]

Plaintiffs in the Underlying Litigation are suing Altice for indirect copyright infringement. They claim that (1) Altice, an ISP, provides internet access to its subscribers; (2) that Altice knew that some of their subscribers were engaged in peer-to-peer copyright infringement of Plaintiffs' music; and (3) that Altice did not do enough to stop that infringement.  Plaintiffs are seeking damages from Altice of over a billion dollars. Discovery closes at the end of January and trial is set for September 2024.

The second point above is where the rubber hits the road with respect to this Motion.  In particular, Plaintiffs contracted with OpSec to identify acts of copyright infringement occurring on Altice's network and send infringement notices to Altice purportedly identifying those acts of infringement. Therefore, the accuracy and reliability of OpSec's system, processes, and notices are a key issue in the Underlying Litigation because they are a predicate to Plaintiffs' theory that Altice should be held liable for the acts of its subscribers. Despite this, OpSec is stonewalling Altice and refusing to produce the discovery Altice needs in order to evaluate the notices—including whether or not they relate to *actual* acts of copyright infringement of Plaintiffs' works.

---

[1] The underlying case was filed on December 14, 2022 and is titled *BMG Rights Management (US) LLC, et al. v. Altice USA, Inc., et al.*, No. 2:22-cv-00471-JRF (E.D. Tex.) (Gilstrap, J.).

Altice respectfully requests that this Court transfer this Motion to the Eastern District of Texas where the Underlying Litigation is pending; or, in the alternative, grant Altice's Motion.

## II. BACKGROUND

### A. The Texas Action for Copyright Infringement

On December 14, 2022, Plaintiffs filed an action in the Eastern District of Texas for copyright infringement against Altice. *See BMG Rights Management (US) LLC, et al. v. Altice USA, Inc., et al.*, No. 2:22-cv-00471-JRF (E.D. Tex.) (Gilstrap, J.). Plaintiffs in that action are record companies that produce, manufacture, distribute, sell, and license commercial sound recordings, and music publishers that develop songwriters and acquire, license, and otherwise exploit musical compositions, both in the United States and internationally.  Compl. ¶ 7.

In the Underlying Litigation, Plaintiffs seek to hold Altice, an ISP, liable for alleged copyright infringement occurring over Altice's network. Plaintiffs allege that Altice's subscribers infringed their copyrighted works by downloading them without authorization through BitTorrent or other publicly available peer-to-peer file sharing tools between 2018 and 2022. *Id.* ¶ 8. Plaintiffs' theory of liability is that Altice tolerated and effectively contributed to and benefited from infringement by Altice's subscribers. *Id.* Plaintiffs' claims for vicarious and contributory copyright liability boil down to the contention that Altice should have, but did not, swiftly terminate any household or business whose IP address was identified in more than a couple of notices of infringement. Each of these claims requires that Plaintiffs first prove instances of direct copyright infringement by Altice's subscribers. This case is one of the latest attempts by the music industry to engineer a copyright-liability regime that makes ISPs responsible for all infringement that takes place on the internet—and thereby turn ISPs into their de facto enforcers.

Years before the filing of this suit against Altice, Plaintiffs, through their agent, the Recording Industry Association of America ("RIAA") engaged OpSec, a third-

party software company that provides a range of services including detecting and monitoring online piracy, to track the activities of Altice subscribers on peer-to-peer file sharing sites.[2] Plaintiffs then authorized OpSec to prepare copyright infringement notices to send to Altice for instances it allegedly observed of infringement of the copyrighted works. OpSec's system was used to detect alleged downloads by Altice's internet subscribers that serve as part of the basis for the secondary copyright infringement case against Altice by all Plaintiffs. Thus, the reliability and accuracy of OpSec's system in detecting alleged infringement and generating these notices is central to Plaintiffs' claims, and critically, at the heart of Altice's defenses. Altice has asserted a number of defenses to Plaintiffs' claims, including that it is protected by the "safe harbor" set forth in the Digital Millennium Copyright Act ("DMCA") because it took reasonable steps to respond to notices of alleged copyright infringement—including from OpSec.

Altice served a third-party subpoena on OpSec[3] seeking documents primarily related to (1) OpSec's technical systems and operations utilized to monitor and detect alleged copyright infringement on Altice's network and generate notices of alleged infringement, and (2) OpSec's services and relationships with Plaintiffs, the RIAA, and Audible Magic (an audio verification vendor used by the RIAA and OpSec). OpSec responded to the subpoena asserting numerous objections and to date has not produced a ***single*** document nor made its source code available for a routine inspection. The Underlying Litigation is proceeding on a swift schedule, with fact

---

[2] Rightscorp, Inc. ("Rightscorp") is another third-party vendor hired by Plaintiff BMG Rights Management to send notices to Altice. Rightscorp's system was also used to detect alleged downloads by Altice's internet subscribers that serve as the basis for the secondary copyright infringement case against Altice.

[3] Altice served subpoenas on both OpSec Security Inc. and OpSec Online LLC. OpSec later confirmed that OpSec Online LLC (f/k/a MarkMonitor, Inc.), not OpSec Security Inc., was the entity in possession, custody, or control of relevant documents and the proper party to receive service of the subpoena. This Motion is therefore directed at OpSec Online LLC.

1    discovery closing on January 30, 2024 and trial set for September 2024.

2         Given that Plaintiffs' infringement claims against Altice rely in part on OpSec's

3    notices, the accuracy and reliability of OpSec's systems, OpSec's investigation of and

4    supposed "matching" of files located on Altice's network to Plaintiffs' works, and

5    subsequent notices it sent to Altice, as well as OpSec's relationship with the Plaintiffs

6    and the RIAA, are the directly relevant to the case. As detailed below, there is no basis

7    for OpSec to resist the production of documents critically relevant to the claims and

8    defenses in the Underlying Litigation. Sustaining OpSec's objections would allow the

9    Plaintiffs in the Underlying Litigation to use OpSec evidence to prop up its direct

10   infringement case while preventing Altice from obtaining critical information to rebut

11   that evidence.

12        **B.    OpSec's Business of Enforcement and its History of Involvement in**

13        **Plaintiffs' Mass Copyright Litigations Against ISPs**

14        For over a decade, OpSec has managed and enforced large portfolios of

15   copyrights on behalf of copyright owners, including Plaintiffs.   OpSec utilizes

16   methods and processes for identifying potential or actual instances of alleged

17   infringement, compares the metadata of an allegedly infringing file with metadata

18   from OpSec's own database(s), and then generates notices of infringement that are

19   sent to ISPs (including Altice). However, Plaintiffs in the Underlying Litigation do

20   not specify how the alleged infringement was identified, how the notices were created,

21   or how, if at all, the information they purported to contain was verified.   Instead,

22   Plaintiffs have repeatedly stated that they outsource this process to vendors such as

23   OpSec, and Plaintiffs disclosed OpSec as a third-party witness with discoverable

24   information in this case. *See* Declaration of Diana Hughes Leiden ("Leiden Decl."),

25   Ex. A (Plaintiffs' Apr. 28, 2023 Supplemental Initial Disclosures).

26        OpSec is no stranger to these litigations, and has routinely forced defendant

27   ISPs to seek court intervention to compel OpSec to produce documents and make its

28   source code available—even as the Plaintiff record companies and music publishers

rely on evidence generated by OpSec (and its predecessor-in-interest, MarkMonitor) to seek billions of dollars from ISPs. For example, in 2019, the Northern District of California ordered MarkMonitor to produce documents and make its source code available for inspection, finding MarkMonitor's objections to be meritless given the relevance of MarkMonitor evidence to the plaintiffs' claims in that copyright infringement case brought by Sony and others against another ISP.  *See* Leiden Decl., Ex. J (*Cox Commc'n, Inc. v. MarkMonitor, Inc.*, Case No. 19-mc-80050-SK (N.D. Cal. Mar. 7, 2019, Dkt. 14) (order granting motion to compel)).  Plaintiffs in cases against ISPs Charter Communications and Bright House Networks also relied on OpSec evidence, and OpSec's objections and refusals to make evidence available necessitated repeated judicial intervention. *See, e.g.*, Leiden Decl., Ex. H (*Warner Bros. Records Inc., et al. v. Charter Commc'n.*, Case No. 1-19-cv-00874-RBJ-MEH (D. Colo. Oct. 5, 2020, Dkt. 253) (order on defendants' motion to compel)).  Notably, in compelling MarkMonitor to produce several categories of documents and a privilege log, the District of Colorado noted that "[while MarkMonitor is a third party in this matter, it has played the key role in collecting the evidence that forms the basis of Plaintiffs' Complaint." *Id*. at 25.  And just last year, the court ordered a representative of MarkMonitor to appear in court to testify about its relationship with the plaintiffs on the eve of trial, directing that "Plaintiffs' Counsel SHALL NOT coach [the MarkMonitor representative] in advance of this appearance."  Leiden Decl., Ex. I (*UMG Recordings, Inc., et al. v. Bright House Networks, LLC*, Case No. 8:19-cv-710-MSS-TGW (M.D. Fla. July 29, 2022, Dkt. 723)).

### C.   Altice's Subpoena To OpSec and OpSec's Objections and Refusals to Produce Documents or Permit a Routine Source Code Review

On June 29, 2023, Altice served OpSec with a Subpoena *Duces Tecum* issued by the Eastern District of Texas requesting the production of documents related primarily to (1) OpSec's technical systems and operations utilized to monitor and detect alleged copyright infringement on Altice's network and generate notices of

alleged infringement, and (2) OpSec's services and relationships with Plaintiffs, the RIAA, and Audible Magic (an audio verification vendor used by the RIAA and OpSec). *See* Leiden Decl., Ex. B. Following extensions of time granted by Altice, OpSec responded on August 2, 2023, asserting various boilerplate objections to relevance and scope and agreeing to produce only limited categories of documents and information. *Id.*, Ex. C. Altice raised its concerns by written correspondence on August 9, 2023. *Id.*, Ex. E. Thereafter, the parties met and conferred on August 15, 2023 and several times thereafter. *Id.*, ¶ 8.

Relying on an express representation made by Plaintiffs in the Underlying Litigation on August 1, 2023 that they would not rely on OpSec evidence for purposes of proving direct infringement in order to "streamline" the case, Altice initially made a number of significant compromises in its negotiations with OpSec. *Id.*, ¶¶ 6, 9, Ex. D.[4] For example, Altice narrowed the scope of the requests to the claims period of the litigation as opposed to the time period encompassing when OpSec initiated its relationship with Plaintiffs. Altice also agreed to accept summary reports as opposed to a more complete set of evidence relating to OpSec's alleged detection of infringement of Plaintiffs' works on its network. Further, Altice did not insist that OpSec produce detailed documentation regarding the reliability and accuracy of OpSec's system, such as documents concerning false positive results from the OpSec System, operational audits of the OpSec System, and documents and communications pertaining to any technical assessments of the OpSec System, or the bugs, flaws, weaknesses, or potential improvements to the OpSec System, and any proposed and/or implemented path or remediation of any such bugs, flaws, or weaknesses. *Id.*, ¶ 9.

However, Plaintiffs subsequently reversed course and withdrew their prior, unequivocal representation—stating on September 20, 2023 that "Plaintiffs will use

---

[4] Plaintiffs at that time represented that they intended to rely only on evidence from Rightscorp, another third-party vendor hired by Plaintiff BMG Rights Management to send notices to Altice.

any and all such information, and rely on OpSec evidence, in any way they see fit, including in connection with proving direct infringement." *Id*., ¶ 11. Altice subsequently informed OpSec that, as a result of Plaintiffs' changed position, Altice would have to insist on OpSec's production of documents in response to the subpoena as originally drafted. *Id*., ¶ 12. In an attempt to reduce the burden on OpSec, Altice offered to accept documents from OpSec in two tranches—one set of the documents that OpSec had originally agreed to produce and a source code review, followed by a second set of documents (including the more detailed notice data) that Altice had been willing to forego when Plaintiffs were committed not to use OpSec data in order to prove direct infringement.[5] *Id*. OpSec rejected that compromise and has refused to produce a ***single*** document or permit a routine source code review. *Id*.

## III.   LEGAL STANDARD

Rule 45 of the Federal Rules of Civil Procedure expressly authorizes a party to issue a subpoena commanding the person to whom it is directed to produce and permit inspection of designated records.  Fed. R. Civ. P. 45(a)(1)(C).  If the third party timely serves objections to the subpoena, "[a]t any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection."  Fed. R. Civ. P. 45(d)(2)(B)(i). "The scope of discovery allowed under a Rule 45 subpoena is the same as the scope of discovery allowed under Rule 26." *Scott v. Carson Sheriff Dep't*, 2020 WL 4108691, at *3 (C.D. Cal. Jan. 15, 2020). Under Rule 26(b), parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense— including the existence, description, nature, custody, condition, and location of any

---

[5] Altice has filed a Motion to Preclude Plaintiffs from Relying on OpSec Notice Data to Establish Direct Infringement, seeking to hold Plaintiffs to their original, unequivocal representation that they would not rely upon OpSec evidence to prove direct infringement in the Underlying Litigation, that Plaintiffs have opposed. Altice will promptly inform this Court if Judge Gilstrap issues a preclusion order that would affect the outcome of this Motion to Compel. Leiden Decl., ¶ 11.

1    documents or other tangible things and the identity and location of persons who know
2    of any discoverable matter."  Fed. R. Civ. P. 26(b)(1).

3    **IV.    ARGUMENT**

4        **A.    This Court Should Transfer This Motion to Texas**

5        Federal Rule of Civil Procedure 45 provides that any motion to compel
6    compliance with a subpoena must be brought in the "court for the district where
7    compliance is required[.]" Fed. R. Civ. P. 45(d)(2)(B)(i). Thus, Altice filed this
8    Motion in the Central District of California, where OpSec is located.[6] However, "[t]he
9    court for the district where compliance is required—and also, after a motion is
10   transferred, the issuing court"—can hold in contempt a non-compliant party.  Fed. R.
11   Civ. P. 45(g). "When the court where compliance is required did not issue the
12   subpoena, it may transfer a motion under this rule to the issuing court if the person
13   subject to the subpoena consents or if the court finds exceptional circumstances." *See*
14   Fed. R. Civ. P. 45(f); *Moon Mountain Farms, LLC v. Rural Cmty. Ins. Co.*, 301
15   F.R.D. 426, 428 (N.D. Cal. 2014). Here, if OpSec does not stipulate to transfer,
16   exceptional circumstances justify transfer to the Eastern District of Texas.[7]

17       First, transfer will "advance[] judicial economy, avoid[] the potential for
18   inconsistent rulings, and prevent[] disruption of the management of the underlying
19   litigation." *Argento v. Sylvania Lighting Servs. Corp.*, 2015 WL 4918065, at *7 (D.
20   Nev. Aug. 18, 2015). The Underlying Litigation involves multiple third parties who

21

22   [6] OpSec is a limited liability company registered to do business in California with
     operations in Glendale, California. Pursuant to Rule 45(c)(1)(A) and 45(d)(2)(B)(i),
23   the Central District of California is a proper venue to move for an order compelling
     production and inspection. *See* Fed. R. Civ. Pro. 45 ("A subpoena may command
24   production of documents, electronically stored information, or tangible things at a
     place within 100 miles of where the person …regularly transacts business in person).
25   While Altice's subpoena to OpSec was directed to its counsel who accepted service
     located in Boulder, Colorado, Altice has subsequently determined that the relevant
26   OpSec entity at issue in this Motion does not have operations in Colorado.

27   [7] Prior to filing this Motion, Altice asked OpSec if it would stipulate to the transfer of
     this Motion to the Eastern District of Texas. OpSec has not yet provided its position.
28   Leiden Decl., ¶ 16.

have relevant information and are based in different jurisdictions. The Eastern District of Texas has issued subpoenas to these other third-parties and should therefore be the forum that oversees and manages third-party discovery due to the overlapping issues of fact and law. Exceptional circumstances also justify transfer where, as here, "a similar motion to compel" could be pending that "dealt with [a] subpoena directed at a different party but sought similar items. *See Moon Mountain*, 301 F.R.D. at 429; *see also*, *e.g.*, *Cont'l. Auto. Sys., U.S., Inc. v. Omron Auto. Elec., Inc.*, 2014 WL 2808984, at *2 (N.D. Ill. June 20, 2014) (transferring motion due to risk of inconsistent rulings); *Wultz v. Bank of China, Ltd*, 304 F.R.D 38, 46 (D.D.C. 2014) (transferring motion because "potential for inconsistent rulings should be avoided and weighs in favor of a single judicial officer deciding all of these disputes").

Here, Judge Gilstrap, who presides over the Underlying Litigation, is familiar with the issues involved in this action, and is well equipped to resolve this dispute efficiently, thus promoting judicial economy. Indeed, Judge Gilstrap is actively presiding over a number of discovery disputes between the parties that relate to similar issues, including motions to compel jointly filed by all parties. Further, Altice has also moved to compel third-party Rightscorp to produce categories of documents similar to those at issue here, and that motion has already been transferred from the Central District of California (where Rightscorp is located) to the Eastern District of Texas and will be heard in short order. Altice has also filed a motion to compel third-party Audible Magic to comply with a third-party subpoena and asked the Northern District of California to transfer that motion to the Eastern District of Texas. There is no reason to disrupt the issuing court's management of the Underlying Litigation.

Finally, "courts are less inclined to find a significant burden on the subpoenaed nonparty when it is a large corporation," *Argento v. Sylvania Lights Servs. Corp.*, 2015 WL 4918065, *7 (D. Nev. Aug. 18, 2015); *see also*, *e.g.*, *Agincourt Gaming, LLC v. Zynga, Inc.*, 2014 WL 4079555, at *8 (D. Nev. Aug. 15, 2014) ("[C]ourts have indicated that concerns regarding the burdens of transfer are lessened when the

disputed subpoena is directed to a large corporation, rather than an individual person."); *In re Subpoena to Kia Motors*, 2014 WL 2118897, at *1 (C.D. Cal. Mar. 6, 2014) (same).  Here, OpSec is an established software company that provides services to the Plaintiffs, record labels and music publishers that represent a large swath of the music industry. Therefore, any burden is significantly outweighed by the benefits of transfer.

### B.      Altice Seeks Highly Relevant Discovery

As explained below, even if the Court were to retain jurisdiction over the subpoena, Altice's motion should be nonetheless granted as OpSec has refused to turn over evidence that is critically relevant to the claims and defenses in the Underlying Action.

### 1.      Documents Regarding The Reliability of OpSec's and Audible Magic's Services and Data Underlying the Verification and Notice-Sending Process

First, Altice seeks documents and information relating to OpSec's notices of alleged infringement and the technical systems and operations utilized to generate notices of alleged infringement sent to Altice.  These requests are:

- ***OpSec's Notice Data and Related Documents*** (RFP Nos. 1-2, 12, 19-21, 36) – data relating to the copyright infringement notices OpSec sent to Altice during the claims period of the Underlying Litigation, any associated evidence retained by OpSec, any copies of Plaintiffs' copyrighted works downloaded by OpSec, and OpSec's communications with Altice's subscribers relating to the notices;

- ***OpSec's System, Source Code and Technical Documentation Relating to the Functionality of its System*** (RFP Nos. 7-11, 31-34) – documents showing the structure, function, capabilities, and operation of OpSec's system used to send copyright infringement notices to Altice and its methods and processes for identifying alleged copyright infringement on peer-to-peer websites, "matching" them to Plaintiffs' copyrighted works, and sending notices to ISPs,

as well as the production of OpSec's source code[8] relating to the systems used to send copyright infringement notices to Altice and related documentation and an executable copy of the relevant OpSec system;

- **Documents Relating to Assessments of OpSec's System** (RFP Nos. 27-30) – documents relating to the reliability and efficacy of OpSec's system (including but not limited to those authored by third parties Stroz Friedberg and Harbor Labs in connection with the Copyright Alert System), and technical assessments of OpSec's system (including any bugs, flaws, weaknesses, or potential improvements);

- **OpSec's Agreements with Audible Magic and Related Documents** (RFP Nos. 5, 13-17) – documents relating to OpSec's relationship with Audible Magic, its decision to rely on Audible Magic to fingerprint, identify, and/or verify Plaintiffs' copyrighted works, and documents relating to the functionality and reliability of Audible Magic's system; and

- **Documents Relating to Complaints Made Against OpSec or its Services** (RFP No. 38).

*See* Leiden Decl., Ex. B.

Notably, OpSec initially *agreed* to produce many of these categories of documents—but has now refused to turn anything over on the basis of Plaintiffs' initial representation in the Underlying Litigation that they would not rely on OpSec evidence to establish direct infringement (which they have now withdrawn, *see id.*, ¶¶ 10-13) and on the basis that Altice must first agree to shift costs (which lacks any merit as set forth below in Section D).

Here, there is no question that the requested information is relevant. As set forth above, the evidence relating to OpSec, and its utilization in turn of Audible Magic's

---

[8] The parties in the Underlying Litigation entered into a Stipulated Protective Order that governs the review of source code produced by both parties and third parties and that includes very strict measures to protect the confidentiality of any code that is made available. Leiden Decl., ¶ 14, Ex. G. Altice provided the Protective Order to OpSec months ago, and OpSec confirmed that it adequately addressed its concerns about confidentiality and the source code review process. Leiden Decl., ¶ 14. Third parties Rightscorp and Audible Magic have already made their source code available for Altice's inspection pursuant to third-party subpoenas served by Altice. *Id.*, ¶ 15.

software, will be critical to Plaintiffs' affirmative case and Altice's defenses. Simply put, the determination of every alleged direct copyright infringement relies on the integrity of the systems and processes of the third-party vendors hired by Plaintiffs— here, OpSec and Rightscorp. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir. 2001) ("Contributory liability requires that the secondary infringer 'know or have reason to know' of direct infringement."); *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007) (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("One infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it.")).

Altice is seeking evidence concerning the accuracy and reliability of OpSec's systems for detecting infringement and sending notices, as well as the data, evidence, records, or information on how OpSec verified the files before sending such notices. For example, OpSec must produce any data or documents that support, or contradict, the accuracy of the notices on which Plaintiffs are relying in this case. This includes evidence supporting the purported verifications of allegedly infringing files for which OpSec monitored, including any documents relating to the audio verification step, among the other discrete categories of documents set forth in these requests. OpSec is also obligated to turn over documents relating to the efficacy of its system, including internal documents relating to the assessments, improvements, and modifications that it made to its systems over the years, as well as external documents and reports from third parties about its system.

And it is exceedingly important that Altice has the opportunity to review an executable copy of the OpSec system, its source code, and related technical documentation to fully understand the structure, function, and operation of OpSec's system that was used to send notices to Altice. While manuals and guides may provide some information as to how OpSec's system functioned, there is no substitute for an

inspection of the code itself to understand how OpSec monitored and detected infringement on peer-to-peer networks, "matched" files to Plaintiffs' copyrighted works, and generated infringement notices. Any objection based on confidentiality lacks merit in light of the strict protections of the Stipulated Protective Order.  Leiden Decl., Ex. G; *see In re Facebook PPC Advert. Litig*., 2011 WL 1324516, at *3 (N.D. Cal. Apr. 6, 2011) (ordering defendants to produce source code for plaintiffs' expert's review because it was "relevant and necessary to Plaintiffs' claim" and because it would be protected by the stipulated protective order); *Trevino v. ACB Am., Inc*., 232 F.R.D. 612, 617 (N.D. Cal. 2006) (noting that protecting orders re used to protect trade secrets, and such discovery is "virtually always ordered" "once the moving party has established relevance and necessity").  Notably, the Northern District of California overruled the objections of OpSec's predecessor-in-interest, MarkMonitor, to producing its source code in a similar case in 2019, holding:

> Allowing inspection by an expert in a secure environment does not pose an undue burden to [MarkMonitor]. Likewise, requiring the production of revision information does not seem especially onerous given the amount at stake in the Eastern District of Virginia action and the fact that [MarkMonitor] is in the technology business. The Court recognizes the value of [MarkMonitor's] source code as a proprietary secret; however, that secret is well guarded by the protective order in place in the underling litigation, which is tailored specifically for source code, and which [Cox's] expert has signed. Source code has frequently been ordered produced in discovery where an appropriate protective order is in place, as one is here.

Leiden Decl., Ex. J at 4. The court ordered MarkMonitor to "comply fully with [the] subpoena … by allowing [Cox's] expert to inspect each version of its system in use during the claim period, all documents regarding the revision history, and associated source code." *Id*. at 5. Similarly, here, OpSec should be ordered to make available its system, source code and related technical documentation relating to the OpSec system used to send notices to Altice, as articulated in RFP Nos. 31-34.

Finally, OpSec has also not explained how the production of this information poses any undue time, burden, or monetary expense. OpSec is an established company whose clients, massive record labels and music publishers, have utilized its services for years to orchestrate and ultimately prosecute a suit against Altice. OpSec has never articulated that its historical systems are not maintained and accessible, nor any burden in producing the data underlying the verification and notice-sending process. OpSec was contractually obligated to prepare and maintain evidence of alleged infringement – if OpSec cannot fully provide any information regarding the systems that generated that data, the only possible answer is that the data was purposefully destroyed or not properly maintained, despite OpSec's full knowledge that it would be necessary to the defense of any alleged infringer.

As such, OpSec's objections ring hollow and this Court should allow discovery into these issues.

### 2. Documents Relating to OpSec's Services and Relationship with Plaintiffs and the RIAA

The next category of documents Altice seeks relate to OpSec's relationship with the Plaintiffs or the RIAA.  These requests are:

- ***OpSec's Relationships, Agreements, and Communications with Plaintiffs*** (RFP Nos. 3, 4, 6, 18, 19, 22, 42, and 43) – documents and communications relating to OpSec's agreements with Plaintiffs under which it monitored and detected copyright infringement on peer-to-peer networks and related pitches or proposals, documents sufficient to show amounts OpSec billed for its services to Plaintiffs, OpSec's communications with Plaintiffs or their agent the RIAA concerning the works-in-suit, the Underlying Litigation, or OpSec's system and services, and any reporting OpSec provided to Plaintiffs regarding its peer-to-peer notice programs.

*See* Leiden Decl., Ex. B.

Again, OpSec initially ***agreed*** to produce many of these categories of documents—but has now refused to do so on the basis of Plaintiffs' now-withdrawn

commitment not to rely on OpSec evidence (*id.*, ¶¶ 10-13), and has also made the production of any documents contingent upon cost-shifting. These requests are plainly relevant because they bear on the operation and accuracy of the OpSec system and OpSec's potential bias toward Plaintiffs in this case, which are squarely relevant to the Plaintiffs' direct infringement case.  For example, Altice should be entitled to any agreements among OpSec, Audible Magic, the RIAA, and the Plaintiffs to understand the scope of the services that it was providing, as well as the systems in place to execute such services. Moreover, understanding whether OpSec made multiple pitches or proposals to the RIAA or Plaintiffs over time can shed light into how and why the system has been upgraded and improved over the course of the parties' relationship. Next, insight into amounts paid to OpSec by Plaintiffs or the RIAA for its relevant services will also reveal information about its bias and motivations to cooperate with Plaintiffs. This same information bears on the applicability of the DMCA safe harbor and Altice's reasonableness in responding to OpSec's notices.

### 3. Documents Relating to the Copyright Alert System (RFP No. 35)

The Copyright Alert System was an agreement between major ISPs (including Altice's predecessor entity, Cablevision), content owners (including Plaintiff Universal Music Group), the RIAA, and the Motion Picture Association of America ("MPAA") to address and deter online copyright infringement. CAS established "[a] reasonable, alert-based approach [to] help to protect legal rights granted by copyright and stem the unlawful distribution of copyrighted works, while providing education, privacy protection, fair warning, and an opportunity for review that protects the lawful interests of consumers." The CAS Memorandum of Understanding ("MOU") required participating ISPs to develop, implement, and enforce copyright alert programs under which copyright owners would send infringement notices to participating ISPs (to be forwarded to subscribers) and set out steps that ISPs would take in response to multiple notices of infringement relating to a single subscriber, and established limits

to the number of notices an ISP was required to process. The parties to the CAS chose OpSec as the exclusive vendor to monitor and detect alleged copyright infringement and send notices to the ISP-members, and it was in the context of the CAS that third parties Stroz Friedberg and Harbor Labs conducted technical assessments of OpSec's system. Documents in OpSec's possession, custody, or control relating to the CAS would therefore be relevant to, at a minimum, the functionality, reliability, and accuracy of its system. OpSec's flat refusal to produce any documents is improper, particularly in light of its failure to point to any concrete burden associated with searching for and producing these documents. Notably, the District of Colorado ordered OpSec's predecessor-in-interest, MarkMonitor, to produce documents relating to CAS in a similar litigation. Ledien Decl., Ex. H at 4-8.

### C.  OpSec's Objections Based on Plaintiffs' *Withdrawn* Representation that They Would Not Rely on OpSec Evidence are Improper

As set forth above, on August 1, 2023, while the OpSec subpoena was pending, Plaintiffs unequivocally represented in a letter to Altice that, in order to "streamline the case," "Plaintiffs will not rely on OpSec evidence to establish direct infringement of the works in suit."  Leiden Decl., Ex. D.  Relying on Plaintiffs' representation that it would not rely on the OpSec notices for purposes of proving direct infringement, Altice made a number of significant concessions in its negotiations with OpSec.  *Id.*, ¶ 9. Then, on September 20, nearly two months after serving its original letter, Plaintiffs abruptly reversed course, serving a letter on Altice stating that Plaintiffs would now "rely on OpSec evidence, in any way they see fit, including in connection with proving direct infringement." *Id.* ¶ 11, Ex. F. Despite Altice informing OpSec of Plaintiffs' change of heart and explaining why it is now necessary to pursue its subpoena as drafted, OpSec continues to object to producing any documents to Altice—parroting Plaintiffs' position that Altice is to "blame" for Plaintiffs' about-face for continuing to seek limited categories of OpSec evidence after Plaintiffs represented that they would not rely on OpSec evidence to establish direct

infringement. *Id.*, ¶ 13. Even if OpSec's claim were true, it provides no cognizable basis (such as relevance or burden) to object to Altice's subpoena. All it demonstrates is Plaintiffs' apparent coordination with OpSec in objecting to Altice's subpoena.

### D. OpSec's Demand for Cost-Shifting is Premature and Baseless

OpSec has refused to produce a single document or permit a routine source code review absent Altice's agreement to shift costs under Federal Rule of Civil Procedure 45. Leiden Decl., ¶ 12. But Rule 45 provides a mechanism for a third-party to seek reimbursement of their actual costs associated with complying with a subpoena only if they are "significant." *Kwong Mei Lan Mirana v. Battery Tai-Shing Corp.*, 2009 WL 290459, at *4 (N.D. Cal. Feb. 5, 2009) ("Rule 45 does not require that all costs of production incurred by non-parties be charged against the requesting party. Cost shifting is necessary only to protect non-parties against significant costs. Thus, a non-party may be required to bear some or all of its costs, depending upon the circumstances.").

Further, the rule does not contemplate, much less require, a requesting party to pay a third party up front, nor does it permit third parties to hold up its compliance with a subpoena unless the requesting party pays or agrees to pay costs that have not even been expended yet. *See McAllister v. St. Louis Rams, LLC*, 2018 WL 6164281, at *4 (C.D. Cal. July 2, 2018) (noting that, in assessing a non-party's request for cost-shifting, "[t]he court reviews time records submitted by the applicant to determine whether the hours were reasonably incurred or if any of the hours were unnecessary, duplicative or excessive, or inadequately documented."); *Nitsch v. DreamWorks Animation SKG Inc.*, 2017 WL 930809, at *2 (N.D. Cal. Mar. 9, 2017) ("*[r]eimbursable* fees are those that are necessary to the third party's compliance and thus benefit the requesting party or are of assistance to the court.").

At this point, OpSec has refused to comply with the subpoena at all—and has forced *Altice* to expend costs associated with conferring with OpSec for months about its improper objections and moving to compel. In any event, awarding OpSec costs in

these circumstances would be inappropriate in light of OpSec's apparent coordination with Plaintiffs in the Underlying Litigation in resisting Altice's efforts to obtain critical evidence.

**V.     CONCLUSION**

For the foregoing reasons, Altice respectfully requests that the Court (1) transfer enforcement of this motion to the Eastern District of Texas, or (2) in the alternative, overrule OpSec's improper objections and order OpSec to produce documents responsive to the third-party subpoena as outlined above and provide a privilege log that complies with Federal Rule of Civil Procedure 45(e)(2)(A) by January 15, 2024.

Dated:  December 20, 2023                    Respectfully submitted,

WINSTON & STRAWN LLP

By: */s/ Diana Hughes Leiden*
Jennifer A. Golinveaux
Diana Hughes Leiden

*Attorneys for Movant*
ALTICE USA, INC. and
CSC HOLDINGS, LLC